In front of us today, we have four arguments that are set, four cases that are set for argument. And one case has, we've already resolved that on the briefs. The first case is Allergan v. Sandoz. Mr. Countryman, Mr. Molenda. And I understand you reserved three minutes of your time for rebuttal, is that correct? Yes, sir. All right, you may proceed. May it please the Court. The District Court's collateral estoppel judgment should be reversed because the asserted claims here present a different issue than the issue that was previously litigated and decided in the prior cases. The asserted claims of the 953 patents cover applying Bimatopros to increase the darkness of eyelashes, while the claims in the prior cases could be practiced without increasing eyelash darkness, but instead by stimulating any of a variety of attempts. 12 of the red briefs, Sandoz asserts that the ex-party testimony submitted to the examiner in the prosecution of 953 was submitted, quote, in an effort to circumvent our decision that the Brandt references are prior art, close quote. And I want to give you an opportunity to deal with that. We don't agree with that at all, Your Honor. As we noted in our brief, in the first Lattice case, there was an issue about whether those Brandt references were actually the work of one of the inventors, Dr. Vandenberg. And the Court there held that they were not because there was no evidence in the Lattice 1 record that she directed the publication of that work. And so what Allegan did was we went back to the Patent Office. We presented that evidence that the Court said was missing in the Lattice 1 case, and the examiner considered that evidence and found that the claims were patentable. And so it was in no way trying to circumvent the Court's opinion. We were supplying the evidence that the Court found was lacking in Lattice 1, and therefore we believe those claims are valid. Why couldn't you have presented that evidence in the Second District Court litigation, which was after this Court's decision? The original infringement of 054, 988, and 161. On that point, it was because we never got an opportunity to do it. We had tried to voluntarily dismiss the Second District Court case. The District Court did that with respect to a couple of defendants, but with respect to Apotex, it granted Apotex's motion without giving us a chance to respond on collateral estoppel. But more generally, what we thought was the claims in that second case still covered kind of a genus of multiple types of stimulating hair growth or enhancing hair growth. And so what we thought was we wanted to go back and get claims that were specific to the species of enhancing eyelash darkness. And so that's why we went back to the PTO. We secured those claims, which are the only asserted claims here, 823 and 26. And now we believe that they present a different and distinct validity issue because— Claim 8 specifically states that the method relates to increasing length and thickness as well. How can you argue that it's only directed to darkness? So it is directed to all three, but in order to infringe Claim 8, you have to show that there's increased darkness. Whereas, to infringe the claims in the prior litigations, you wouldn't necessarily have had to show that the Matapros increased darkness. I thought, though, that the darkness was in play in the original litigation. I'll call it Latisse 1. Right. For example, you accused the other side's labels of infringing because it talked about increasing hair growth, including at least increasing length, thickness, and darkness. So darkness appears to have been in play in the course of that litigation, both infringement and validity. And so that's why I'm trying to figure out if we read that claim in Latisse 1, especially as it was construed to include darkness, then, in fact, it was resolved and litigated in the first instance, right? I disagree with that because the claim in Latisse 1 was directed to a genus of all sorts of types of stimulating eye growth. So certainly darkness was one of the ways you could have infringed that claim because it talked about converting vellus to terminal hair. But there were many other types of options that you could use to show stimulating hair growth in Latisse 1, increasing thickness, increasing the number of hairs, increasing the length of hairs. I guess what I'm wondering is why isn't it right that Allergan put all of those different versions of hair growth in play in Latisse 1 through the claim construction it saw, which was all these different types of hair growth recited into the preamble of the claim as a replacement for the actual recitation of increasing hair growth? And then, OK, now we know that hair growth can mean all these different things. And now that claim, because it was invalidated by our prior panel decision, why is it that you can now pick and choose any one of those and say, well, even though that claim was invalidated, that covered all of those different versions, we're now going to select one of those versions out and try to relitigate that? I think the answer is because it's the difference between obviousness of the genus and obviousness of the species. And so the prior Latisse 1 case held that the genus was obvious. And all of the invalidity evidence in the prior case dealt with the genus. Like the Brandt references just referred to eyelash growth generically. They didn't talk about whether it was darkness or length or number of hairs. And so the difference that we see is that in this case the claims are limited to one species. And I think there's general cases from this court that say that even if the genus might be obvious, a particular species might be separately patentable. When we're looking at collateral estoppel, and we're looking at the Fourth Circuit, and they have identified prior litigation by issue, whether the issue is identical or not. What I'm interested in knowing from you, in our own precedent, are we looking at issues or are we looking at claims? I think we're looking at whether it's the same issue. And the way you do that is you compare the claims from the first case to the claims to the subsequent cases. And you ask do the claims in the subsequent case present some kind of different issue with respect to validity that wasn't litigated in the first case. Is the court's law more specific than that, whether the actual issue was litigated? For example, in Lattice 1, whether the issue of darkening was actually litigated or not? I mean we know it's in the claim where there's a darkening element in the claim, correct? So if we went just by claim, we would say you're precluded. I disagree with that because there's a difference between those claims in Lattice 1 were genus claims, that yes, they included darkness, but they included all sorts of other things. Whereas we have different claims here that are just limited. In this case, how does a darkening occur? Is it through the vellus to the terminal type transformation? I think it's unclear based on the record. I think generally speaking, darkening happens because you're getting more pigment in the lashes. And so I think one way in which that could occur would be the change from vellus to terminal. Then why wouldn't we find that, whether you're looking at claims or issues, that vellus to terminal was present both in Lattice 1 as it is in this case? I think it is present in both cases, but the difference is that in the first case, it was just one member of a broader genus. And what was critical there was the invalidity evidence was just at a generic level. What does it matter? It's part of the claim construction. Vellus to terminal is part of the claim construction. So the issue, if you want to look at it in terms of an issue, the issue is teed up for controversy, for adjudication. I don't think that issue of vellus to terminal hair was actually litigated in Lattice 1 because all the invalidity evidence was more generic. Another way of asking the question is, it merely just broadly said increasing hair growth. And maybe if we just talked on that level, we wouldn't exactly know what hair growth necessarily encompassed. But then Allergan sought a very specific claim construction that laid out all the different aspects of what it understood to be hair growth. And so why is it wrong for us to look at what happened in Lattice 1 and the grouping by Allergan at Allergan Scourging that all these different features stand or fall together? And because they ended up falling, then you can't come back and then break out any one type of aspect of increasing hair growth in a future claim and litigate that. So it's kind of a stand or fall together, rise or fall together concept that I think makes me wonder if you're barred here from pursuing the darkness claims. I see what you're saying, Your Honor. I guess my thought would be, I mean, you could say that about any case in which you have claims to a genus, claims to a genus and claims to a species. And there are cases that say you can separately claim a species, and that might be non-obvious, even if the broader genus would be obvious. And so the grouping, I think, just speaks to that. Yes, it's true there was a genus in Lattice 1, and that's obvious, and we accept that. But I don't think that that necessarily precludes us from litigating whether a particular species within that genus has some novel and non-obvious properties. And here I think it is, because when you look at the prior art that was at issue in Lattice 1, it's just generic to eyelash growth. And there's no suggestion, for example, that the Brandt references that we would necessarily know, or what a skilled artisan would know, that Brandt, when he was saying eyelash growth, was meaning it to encompass all of those. And now we're circling over to the other side of my concern with this case, which is it feels like through the claim construction, and it's proven up, confirmed by the specification, increasing hair growth by the application of dimatoproste to your eyelid necessarily results in all these different things happening, whether it's increasing or converting vellus hair to terminal hair, lengthening the eyelashes, thickening the eyelashes. Why isn't a way to look at this case is the real issue that was resolved in Lattice 1 was whether it would have been obvious to apply dimatoproste to an eyelid. And as soon as the conclusion there was, yes, it would have been obvious, then all of these descriptions of properties or results you get from that single method step are just inherent properties. And so therefore, that's the other way I'm looking at this case. Okay, you want to now claim this particular nice result you get from that application of dimatoproste. And maybe you want to make an argument that the Lattice 1 claims were describing some other different nice property you get. But it's all one and the same in the sense that the law is clear that you can't get a claim on an inherent property or result on a previously understood to be invalid method claim. I guess I would phrase the question slightly differently. I don't think the question in the prior case was whether it was obvious to apply dimatoproste to the eyelid. In general, I think the question was, was it obvious to apply it to the eyelid to grow eyelashes? And I think the question here is different. It's would it be obvious to apply dimatoproste to the eyelid to darken eyelashes? And on that question, Brant is silent. And so all you're left with is the Johnstone reference, which talked about a different molecule. I'm sorry. But isn't it really to grow darker eyelashes rather than to darken eyelashes? I think it could potentially be both. I think you could either be growing eyelashes that are darker or perhaps if you have eyelashes that are there, it would darken the eyelashes you do have. I think in either case, it's still distinct, though, from the broader genus that was at issue. There's nothing in the specification or any of the claims back in the 404 or here in the 953 that suggests that there's some kind of different, unique regime in the application of the dimatoproste to the eyelid that gives you the result of darker eyelashes as opposed to growing eyelashes, whatever that means. As I understood the spec as well as the very broadly recited claims, it's just apply the dimatoproste, topical application of dimatoproste. You get these wonderful results. And there's no distinction in how you do it, when you do it, how many times you do it a day. Is that fair to say? I think that's fair, Your Honor. I think the difference is just that the prior art doesn't speak to darkness. It speaks to growth. And if I could just say, just turn to another issue very quickly, the issue on the Sandos judgment, the fact that it extended to all the claims as opposed to just the asserted claims. That's a very important issue for Allergan. It was very clear from our second amended complaint that we were just asserting claims 8, 23, and 26. The complaint's very clear on that, A, 1884 through 88. Did the district court judge accept the amendment? Yes. So the magistrate judge. So the magistrate granted the amended complaint. That was then filed. That became the operative complaint. And there was no suggestion that the district judge ever overturned that or in any way suggested that we couldn't file. Except that he issued an order invalidating the entire path. I think on that, Your Honor, it was just, I don't know, but I would suggest it was just kind of a pro forma. The 953 isn't valid. A lot of the other defendants agreed to correct it to just claims 8, 23, and 26. The district judge accepted those corrections. And so there was simply no subject matter jurisdiction for the court to invalidate those other claims. And I would just say there are some dependent claims that are very, very different. Claims 17 through 19 in particular. Claim 17 talks about applying it to the scalp. Claims 18 talks about applying it to grow eyebrows. Claim 19 talks about using emulsions. And so there are definitely some claims in this patent that are very, very different. Okay. I think we have that argument. And you're well over your time. But I'll restore you two minutes, okay? Thanks very much, Your Honor. Thank you. Good morning, Your Honors. May it please the court. I wanted to follow up on one of Judge Chen's questions regarding the claim construction. Judge Chen, you're zeroing in on exactly the correct issue with respect to what Allergan has done here. They sought a very broad construction below on this issue of method of stimulating hair growth in the 404 patent. And, of course, the reason why they did it, as you said, was in order to cover us, all of the defendants, for purposes of infringement. So they asked for a broad construction. They got it. And now they're stuck with it. And, in fact, they asked for this broad construction, and in the 404 and 953 patent specifications, what those patent specifications tell us is that this conversion of vellus and intermediate hair going to terminal hair, that conversion results in an increase in pigmentation. That's an admission within the patent specifications themselves. And as a consequence of that, when Judge Eagles was interpreting her own construction in her order in this case, she said that, by definition, darkness is present within that construction. So darkness has always been there. Mr. Countryman's counterargument is that, yes, increasing hair growth should be considered perhaps a genus of lots of different things, but in Lattice 1, the real focus was on increasing the length of the eyelashes. It was never the debate, the focus, the litigation was not about increasing the darkness of the eyelashes. And so is it unfair and inappropriate use of collateral estoppel principles to now block them from pursuing a specific type of growing hair that wasn't actually litigated and resolved in the first instance? Well, I think you picked up on that issue exactly correctly, which is literally we're splitting hairs here because what we have is a method of enhancing growth and a number of attributes that flow from that. And, in fact, Allergan has admitted in more than one place that these are merely attributes of hair growth. In fact, it says it in its own label, and it said it in its post-trial briefing. And, in fact, in the claims themselves in the 953 patent, several of those claims actually refer to length, thickness, and darkness as attributes. In the claim construction of the district court, it included the vellus to terminal transformation. So who proposed that language? That was proposed by Allergan. So it proposed that broad construction in order to try to cover the defendants for infringement. So now it's stuck with that broad construction. And so just to follow up, Judge Chen, on the issue of Allergan's admissions. So if you look just at the Latisse label, for example, it says— I'm sorry, but apart from the construction, was there actual arguments going back and forth concerning the vellus to terminal change? Well, not to that specific issue, but with respect to the construction of method of stimulating hair growth, we wanted a narrower construction. So in collateral estoppel, are we looking at whether claims have been adjudicated or whether issues have been adjudicated? We're looking at whether issues have been adjudicated, but in this court's decision in Ohio Willow, one of the things we look at is the substantial similarity of the claims, first of all. And second of all, we look at whether or not the differences in the claims materially alter the validity of the analysis. And here they do not because, as Allergan has admitted, darkness is baked into this construction. So darkness has always been present. So there are no meaningful differences that alter the validity analysis here. How is darkness achieved in the asserted patent? How is darkness achieved? Well, what we can discern from the patent is that it is one of the attributes that is associated with increased hair growth, along with a number of different attributes. And it's vellus to terminal, one of those? That's exactly correct, Your Honor. Because you're moving from non-pigmented hairs to pigmented hairs. Exactly correct. And they haven't disputed the fact that pigmented is synonymous with darkness or darker. In fact, they would have a real problem if they did because in the patent specification itself, you'll find the word darkness and you won't find it anywhere. So they would have a real 112.1 problem if all of a sudden they're saying that pigmentation and darkness are not synonymous. That's really the only support they have for that. So at some point, it looks like we're being asked to buy into this concept that dark means growth for longer. I think it's just simply an attribute. It's an attribute that— Yeah, if something's darker, it stands out, right? Correct. But that doesn't make it longer. Or if you darken something, you don't grow it. But I think if you enhance growth, one of the attributes— in fact, if you look in the patent specification— What you're doing is you're enhancing growth of pigmented hair as opposed to smaller, finer non-pigmented hairs. Exactly. You're going from vellus or intermediate hair to what are called terminal hairs. It's part of the claim construction. That's right. It's baked in. The claim construction that Allergan urged was translating increasing hair growth to doing all these different things. Exactly. One of them was converting vellus hair to terminal hair, and that wasn't appealed by anybody. Correct. Not by you. So we all have to live with the construction that converting vellus to terminal hair is a part of increasing hair growth. I would have to agree with that, Your Honor. But was there actually any arguments on that point? I mean, it seems that the record, the way I see it, is that that whole question of converting vellus to terminal hair, it wasn't actually litigated. Well, that's what Allergan proposed. That's what it stuck with. It admitted that. I mean, it urged it. It needed it to demonstrate infringement of defendant's products. And so now it's stuck with it. And we did not appeal it. One of the elements of collateral stop was whether the issue was actually litigated. Right. Going back to this, are we looking at whether the claim was litigated? Here the answer is yes. It was clearly litigated. But was the issue of darkness in Latisse I actually litigated? Did you argue against their construction? We did argue against their construction. And what was your argument? We argued for a narrower construction. Basically, it was a plain meaning construction. And the court's order is rather short on this point. But we essentially argued for a plain meaning construction. And that's on page A3072 of the appendix. And so the court opted for Allergan's construction. And we did not appeal that. But I guess what we should try to come back to is what— And in the prior litigation, that claim as construed to cover all those different interesting attributes of growing hair was invalidated. Correct. Under Section 103. That's exactly correct. And that was the reasoning that was used to apply collateral estoppel to the next three patents. And then, of course, the patent here. And I should point out one thing with respect to the 054 patent in case number two. The 054 patent also had this darkness limitation present. And what's fascinating about this is that Allergan never defended that patent. And if we look at claim one of the 054 patent, it lists darkness specifically. It specifically recited. Allergan did not defend that patent. It did not appeal the ruling of collateral estoppel to this court. This is the case where they sought voluntary dismissal, correct? That's correct. And the court went ahead and chose the route of invalidating those patent claims under collateral estoppel. Correct. But it didn't appeal that ruling, and it could have. It had every opportunity to litigate the issue of darkness, and it didn't. Anything else? If you want to address the issue regarding the sufficiency of the decision to cover all the claims or just some of the claims? Sure. I'd be happy to, Your Honor. Judge Eagles looked at this case as a whole, and particularly Allergan's conduct in serially litigating the same sets of patent claims over and over again. And what Judge Eagles did was she knew Allergan would be back for a fourth bite at the apple. So she looked to the First Amendment complaint as the operative complaint here, and that complaint asserts the 953 patent in its entirety. Is there any way in the record where the judge said, even though the magistrate judge accepted the Second Amendment complaint, I'm not. I'm going to stick with the First Amendment complaint. Right. The record is not clear on that point, Your Honor. The best we have is a paragraph on page A5 of the judge's order, which seems to allude to that, but we don't have full clarity on that point. But what we do know is that under this court's principles of why collateral estoppel exists, for reasons like public interest, expediency, justice, the reasons why collateral estoppel is applied, and that's in this court's Comair decision, Judge Eagles looked at this case and said, we have a serial litigant asserting substantially the same patents over and over again, and I'm going to put an end to this litigation, Your Honor. You're talking about Latice 2. We're talking about Latice 3 here. She did the same thing in Latice 2 as well, for sure. But I understand you're telling us a story about what must have been in the judge's mind. Correct. We don't have anything like that in the record where the judge is saying all the things that you're saying. Fourth bite at the apple, serial litigator, want to put an end to this, looking for finality. Therefore, I'm going to reject the Second Amendment complaint and just stick with the First Amendment complaint. So is it fair to say that this is your interpretation of what's going on rather than at least an equally plausible interpretation, which is the judge was not as focused on the fact that the Second Amendment complaint had scoped down the case to just three claims? I think it's fair to say that this is our interpretation of this point, but I think it's a fair one based on the record. Do you think that Latice 2 provides an independent basis for estoppel? Well, in that case, that was relying upon Latice 1 for purposes of collateral estoppel. So there wasn't actually a full litigation that happened with respect to Latice 2, but I think one important point that is applicable here is the fact that they never appealed the judgment with respect to collateral estoppel of the 054 patent, which has the same darkness limitation at issue here. They never appealed that even though they had the full and fair opportunity to litigate that point. So that's crucial. So while there wasn't a full-blown litigation because collateral estoppel put an end to it, that's a very crucial point that should inform your analysis with respect to this case here. They had the opportunity to litigate and appeal the issue of the 054. Well, I guess that's my point. If the court finds estoppel applies and then a party fails to appeal that, are they estopped now from advancing arguments that they could advance or maybe should advance in Latice 2? I think they're certainly stuck with the judgment with respect to Latice 2, but I think what they're stuck with is the fact that they're making an argument that darkness is somehow separable from method of enhancing hair growth when, of course, it isn't. It's just simply an attribute which they admit. The 054 patent reflects the fact that they had the opportunity to argue this issue, that it would have saved the validity of the 054 patent claims, and it didn't. Are you saying it's law of the case in that instance rather than estoppel? I think it's fair to say that their failure to argue that point, it could be considered law of the case, but it should inform the analysis here that they didn't really believe that darkness is a patentable distinction of any merit that actually alters the validity analysis. If they had, they would have appealed that judgment just like they had done this one, but they didn't. May I point out one of the touchstones of the analysis of collateral estoppel is the question of whether or not there's substantial similarity between the claims, and one thing that really hammers home the substantial similarity between the claims that issue here in the 953 patent and all of the preceding claims. Okay, I'm going to stop you there. Is it really the claims are substantially similar or the issues? The claims. The claim language is substantially similar. In other words, their scope. Of course, the next question after that is do those differences, because these are really related questions, do those differences, do they meaningfully alter the validity analysis? You're talking now, you're referring to Ohio Willow. I am at that corner. That's not the expression of the standard of collateral estoppel. Which portion of that? Well, it doesn't say Ohio Willow doesn't say that we're dealing with claims and not issues. Right. It says, is without dispute that the asserted claims of the 237 patent are substantially similar to the invalidated claims of the 082 patent. This is directly from Ohio Willow, Your Honor. Well, we say our precedent does not limit collateral estoppel to patent claims that are identical. Rather, it's identity of the issues that were litigated that determines whether collateral estoppel should apply. Absolutely. And I think that latter point informs the former point. Really, you're drawing a Venn diagram here. Correct. That's exactly right. Right. And all I wanted to point out before I sit down is the fact that all of these claims are directed to the same thing, which is a method of enhancing hair growth. And I would just like to point you to one page of the record, which is A2616. This is very important. Say it again. A2616. Okay. Just a second. Sure. Okay. Okay. During prosecution of the 953 patent, and this is really why I'm focusing on the claims here because all of these claims cover the same thing. It's a method of enhancing hair growth. This is what Allergan argued when during prosecution in overcoming a piece of prior art. It said the preamble is limiting, so we can get around this prior art for the following reason. And this is the middle paragraph. It is clear upon review of the application that the new use for the old compounds for stimulating hair growth, including eyelashes, eyebrows, and scalp, is the invention. The title of the patent application is entitled Method for Enhancing Hair Growth, and we're referring to the 953 patent application here. The spec clearly describes that the invention is for hair growth, including eyelash growth, and this is really the key part. It would be nonsensical to read the most fundamental part of the invention out of the claims. And in fact, they even take a step further on the same page below that and say that the reasons why the preamble should be limiting in this case is exactly the same reason why it was limiting with respect to the 404 patent. So it's explicitly linking these patent claims together. They're all claiming the same thing. All these issues have been decided. Okay. Thank you, Your Honor. Thank you. Mr. Countryman, we'll restore you to two minutes. So just very briefly on the last point that counsel made, we don't see anything particularly interesting about this comment on A2616. All the applicant was saying here is that the preamble of the 953 claims is limiting, and it certainly is. This doesn't speak to the issue that we have before us, which is the genus versus species distinction. Otherwise, I'd just like to focus on the scope of the Sandoz judgment. So, Judge Chen, to pick up on your question from earlier, there is nothing in this record to suggest that the district court was operating on anything other than the second amended complaint. And actually, if you look at Sandoz's motion to dismiss that was granted and that we've appealed from, Sandoz's motion to dismiss was of the second amended complaint. And that's at A1918 through 1919. It says at the beginning, Defendant Sandoz, Inc. respectively moves this court pursuant to Rule 12b-6 to dismiss Allergan's claims in its second amended complaint, alleging that Sandoz infringes the claims 823 and 26 of the 953 patent. And it goes on. And so the district court didn't even have a motion before it to dismiss or find collaterally stopped any claim other than these claims 823 and 26. And just with respect to the comments about serial litigation, obviously we disagree with that. But I would say, especially with respect to claims 17 and 19 that go to the scalp and the eyebrows and the emulsion, there's no suggestion that Allergan would be asserting those against Sandoz. Sandoz isn't seeking approval for those indications on its products. And so there's absolutely no case or controversy. At the end of the day, do the differences between the adjudicated claims and the unadjudicated claims, do they really affect the issue of invalidity? I mean, we think that's true for many of the claims, but especially with claims 17 and 19, absolutely. I mean, all the prior art in the first case was about whether you could grow eyelashes. There was no discussion about whether you could grow scalp hair or whether you could grow eyebrows. All the prior art in the first case was about ophthalmic solutions, not emulsion. Just one last question. How many more patents or patent applications does Allergan have when it comes to the use of dimetapros to grow hair? I don't know. We've been working our way through a lot of them. Are we at the tail end here, or is there more to come? I don't know the answer to that one way or the other. I do know there's a co-plaintiff, Duke, who is a co-plaintiff in the first case. I know they have one application that's a descendant of the 029 patent from the first case that's been allowed. I don't know about other patents. Okay. Thank you very much. Thank you.